Case number 21-5827, United States of America v. Quincino Waide. Order of largeness not to exceed 15 minutes per side. Mr. Nash, you may proceed for the appellant. My name is Patrick Nash. I represent the appellant, Quincino Waide, and I would like to reserve three minutes for rebuttal. Back in July of 2018, there was a shed fire in a modest shed on a street in Lexington, Kentucky. The next day, four fire department investigators, two narcotics detectives in tactical gear, and at least one other officer descended upon the apartment building next door to where the shed fire occurred. One of the things in the report or in the warrant application was there was a suggestion or the statement that the fire was incendiary, which would suggest that it was said or an intentional act at least. Why was that not enough to establish a probable cause of a crime? Well, there was a mention of incendiary and also a mention of arson in the warrant affidavit, but those were just conclusions and there wasn't a single fact in the warrant affidavit that supported either of those conclusions. When the issuing magistrate looks to decide whether there's probable cause, the rule is they can't be a rubber stamp for the officer, so when the officer comes in and says just in a conclusory way, it's arson, it's incendiary, there needs to be some fact. Well, I mean there was a report of there wasn't a lightning storm. I mean it's close, but you know, why isn't it enough, I guess, or why at least would it not be good faith? Well, two questions. I'll answer the first one first. Why isn't it enough? True, there was no lightning storm, but none of those facts were put into the affidavit, so as far as the issuing judge was concerned, that person knew nothing about the person who was seen removing items. That came from an anonymous source. The anonymous source, it turns out, wasn't even a person that anyone ever talked to. It was just the word out there. Again, none of that was in the affidavit. There was no corroboration of the source in the affidavit. There was no indication of the source's veracity or reliability. But we know there was a fire, right? There certainly was a fire. That's not contested at all. That's correct, and you know, a fire, of course, can be, as was noted, you know, there can be numerous causes for a fire. It could be accidental, could be a storm. Again, there was no information in the affidavit to give the reviewing judge an idea about that. Now, Your Honor asked about the good faith exception. Why would it not be good faith? I go back to the idea of what was the source of the information in the affidavit. It was an anonymous source that was completely uncorroborated, that there was no information about. It was a source that the officer had never spoken with, and we have cases from this circuit regarding affidavits that are so obviously deficient that no reasonable officer would rely on them. What would be your best case for that? So I would point the court to the Helton case, and in that case, we had, that was the case where there was an anonymous tip. The person, the tip concerned drug dealing and storage of money in a house, and this court said that because the tip was completely uncorroborated, no rich detail, and no reliability of the tip, that not only was that not a probable cause, but it didn't pass the Leon threshold either. How do you distinguish the recent case cited by the government, Hearn, which was just sent to us last Friday? Right. So, Your Honor, the Hearn case is, you know, a fruit of the poisonous tree sort of decision, and we've argued that that doctrine should apply here. The Hearn case and the Elmore case, cited by the government, both were cases where fruit of the poisonous tree doctrine was not applied. And I think there's one critical distinction in both of those cases, and that is the idea of whether the police exploited the illegality. In Hearn, you had a pat-down search that was unlawful. Produced nothing. The pat-down search produced nothing, and once the search was over, the defendant was just told to go stand by his friend, and there was no indication by the police that there was going to be any further action, any further searches. But the defendant, unfortunately for him, made a spontaneous statement at that point. There was no exploitation of the illegality. In our case, we have an illegal camera search warrant that was executed to some extent, and through the activities of the officers and through that execution, my client's confession was obtained. Did they ever search the camera we're looking for? That's what the first search had to do with, right? They wanted to look at these cameras that the owner didn't want anybody to look at, right? That's correct. And ultimately, they did search the cameras. Yeah, but didn't they have something intervene? Had the second warrant coming in? Yes, sir. So the sequence was they began the execution of the camera search warrant, and then once they got the confession from my client... Well, I mean, isn't that the rub, though? Did they begin executing it? They certainly threatened to execute it, and I think the problem... Let's assume the DVR warrant's bad. Your client essentially confesses, seems to me. It's kind of like a confession case. It seems to me all of the confession cases, or almost all of them, involve the police presenting the illegal evidence to the person, saying, we've got you, and the person says, all right, fine, you got me, I confess. In this case, they didn't actually execute the search. They don't actually have the marijuana. They don't actually give it to them. They just say, we're going to go into your house. Is there anything you want to tell me? It's a threatened execution of the warrant, and I'm curious whether that seems to be a fact pattern that I haven't seen, the threat, as opposed to actually having the evidence and presenting it. Does that make sense? It does, Your Honor, and I understand your distinction, but I would say in response that the threat of the warrant producing the client's confession is really, as a practical matter, no different than having the evidence and showing it to them. So what happened here was, it was a little more detailed. They had the warrant. They come to the scene, a group of them. They tell everybody at the scene, we're going to execute this warrant. Call the owner to come help us execute it. So they actually bring the owner to, which the owner is my client, Quincinio. They actually bring the owner to the premises, and when he gets there, he says, I'll just go in and get it for you, and they decline that. They say, no, no, we're going to execute this warrant, and they cuff him, and they obtain this confession from him. And that's... Because what, Officer Cuttsinger, is that his name? Kurtzinger, yes, sir. Tells them, do you have drugs, is that your problem, or something to that effect? Well, so he, right, exactly. So Officer Kurtzinger noticed that when they told him they were going to execute the warrant, they noticed he got nervous, and he got angry and upset, and so that caused the officer to ask... What about the car, too? Right. I mean, I mean, that was, he smells marijuana, he goes over the car, they search it, right? They, I mean, isn't that kind of independent of the, independent of the war, of the threat to execute the warrant? Isn't the car search kind of provides another avenue here, or is that, is that not sufficient? They did, they did search the car, but I would say that that's all directly connected back to the execution of the warrant. You know, but for them coming to the property, telling the people... But it's not a but-for test, right? I mean, Long Son says that. That's true, it's come at by, by way of the primary illegality. But whether you call it but-for, or whether you call it, I'm coming at this evidence by the fact of the matter is, the reason he brought the car to the scene, the reason he came to the scene, was the officers there on the scene executing the warrant, saying, call this man, have him come to the scene so that we can continue to execute this warrant. When did the second warrant come to be, in relation to the first warrant that you say is illegal? It was within a matter of hours, Your Honor. The record is not entirely clear precisely, but when, when the confession was made and when the marijuana was discovered in the car, and my client was cuffed, then they went to get the second warrant, and... It was based upon his sort of admission and telling about the marijuana, so that was the basis. You don't, you don't dispute the second warrant at all, except for the poisonous tree, is that what it is? Actually, there's a second and the third warrant, because one was for Apartment 1 and one was for Apartment 3. That's right, and they were basically identical warrants and identical affidavits. So you're saying all of this is either exploitation or fruit of the poisonous tree, if the DVR warrant is invalid? So everything hinges on the validity of the DVR warrant, right? That is our position, Your Honor, and again, I go back to the Wong Sung, where fruit of the poisonous tree is applied if the evidence is come at by exploitation of a primary illegality. Now, let me ask you this about the, the Apartment 1 warrant. There was the exigent circumstance of the hole in the ceiling or whatever, right? Is that in the, is that in the Apartment 1 affidavit? It's in both the 1 and the 3 affidavits. Okay. Apartment 1 and 3, yes sir. Okay. Why is that not some kind of independent reason to get that warrant, even if the confession was not, I mean, is that also fruit of the poisonous tree? Is that the argument? Yes sir, it is, and I would, you know, it's, in a way, it's no different than the confession itself. If the confession was... Destroying evidence is kind of an independent volitional act, an independent criminal volitional act. Is that different than the confession, or you're saying they're basically the same thing? I'm saying they're basically the same, and the reason is they're both are inculpatory acts of the defendant that was caused directly by the execution of the illegal warrant. They wring a confession out of him, and then he engages in other inculpatory conduct, destruction of evidence. It was actually, he was said to be whispering to the people who destroyed the evidence. It's actually his mother and his cousin Vance. Yes sir, and maybe one or two others, but yes, that's all directly, again, none of this happens. Quincinio is never even on the scene, you illegal camera warrant. Well, if they'd just come there without the first warrant and start talking and discussing it, that'd been okay, right? Potentially. Unless he wanted to raise his Fifth Amendment rights, but they could have said, well, we think you've got some marijuana out there, but, and he blurted out, that's okay, and it, it's upheld, right? Because then you'd have a second warrant, it's good. Why isn't that a substitute for what you're saying? So, so under those facts, I think you're correct, Your Honor, but, but the distinction I would make is, is that they had no suspicion about drugs or marijuana, but for, except for the fact that they came out there to execute the, the, the bad warrant. Well, yeah, well, kind of. He was kind of on their radar, which is actually, I think, a good fact for you in the sense that they were maybe using as an excuse that they were exploiting the fire to carry on an investigation, a drug investigation of your client. Certainly, the narcotics detectives were. Now, the fire department folks, you know, had no role in that. Okay, thank you. Thank you, Your Honor. We've got your rebuttal time. We'll hear from the government. May it please the Court, Lauren Tanner Bradley for the United States. I do think that the crux of this case turns on this idea that the poisonous tree doctrine really doesn't apply in this situation where you don't have the execution of the warrant. There was no. Why? Are you conceding the DVR warrants back? No, not at all. I'm simply saying that we don't even have to get to that point. This is what I don't understand. I mean, they certainly threatened to execute the warrant. They tell the mother to call the owner and get him there, which she does. Why is that? How is that any different than if they just go into the house and search it? I mean, they're going to do it. He's got the stuff in there, so he, you know, he tells them. I don't know why the threat would be any different. I don't think that there was a threat in play here. I don't think these officers were going to be a threat. Well, they threatened to execute the warrant, didn't they? Right. What happens is they go to the apartment. They knock on apartment 3. No one is home. They go downstairs because they can see that her son is there and if she could call him because they have a warrant for the apartment. Then two officers meet with Mr. Wade in the front of the house when he arrives minutes later and they have a conversation about the warrant. There's a bit of back and forth. Grace says, oh, it's not my apartment. I don't know if I have a key. They're asking for a key to access the apartment. Then he becomes nervous and the officer says, why is it that you're nervous? Do you have drugs in the apartment? That's when he makes this confession that yes, there's marijuana in the apartment. Prior to that, they said, no, they declined his offer to him to get his own equipment and bring it down. No, they're going to execute this DVR warrant. It's not clear from the record prior to that that he actually made this offer to provide the DVR equipment, but you could also see that the officers are in a bit of a tricky situation there. Once consent is denied to obtain that kind of evidence, we would be right back here where he would say, well, I wasn't actually consenting to give you that. And then he would be challenging the evidence on other grounds where consent was actually never obtained. So I think that's why at that point the officers say, you know, you already said we couldn't have it, so we're just going to use the warrant that we have. Right. So you're not contesting that they said they're going to execute the warrant. They told him they're going in to execute the DVR warrant, right? Yes. Yes, they are saying that they're going to get the warrant. But again, I still think at this point the officers haven't done anything that they're constitutionally prohibited from doing. Like you said, they could have just done this as a knock and talk. They could have just gone up to the apartment and said, we'd really like to get that DVR equipment. Why is it that you won't let us have this DVR equipment? Is it because you have drugs in the apartment? I don't understand that, though. They have a warrant and we're assuming the warrant is bad. So they have a warrant that is not supported by probable cause. They have like this phony piece of paper and they go up to him and say, we're going to, under the authority of this thing, which is invalid, we are going into your house. Is there anything you want to tell us? I mean, I don't understand. He's not confessing just because he feels guilty in his confessing. He's confessing because they're going to go into his house, right? I mean, certainly it's a but for. I mean, I guess the question is whether they're exploiting the illegality. And I don't, I find it difficult. I mean, maybe there's a difference between actually executing, physically going into the property and threatening to do it. But I'm not sure I see the line. And Kentucky v. King, for example, uses threat, the word threatened or execute, right? Or violation or threatened violation. So the Supreme Court at least has alluded to a threat of executing the warrant being enough, right? So I'm just not seeing the line. I'm not specifically familiar with that case, but I don't think there have been... Kentucky v. King? You're not familiar with Kentucky v. King? Not the facts of it. Okay. Okay. But here, I don't think that there, no one actually asserts that this was a coerced confession, something along those lines. But I do think that there is a difference between... I mean, yes, it is kind of coerced, isn't it? Isn't it of a piece with that? I mean, it's kind of like, hey, we're going to go search your apartment. And by the way, the police are suspecting that this guy is involved with drugs, right? There's a narcotics that he's a known kind of person in the police narcotics, among the police narcotics people. So hey, what do you want to tell us? I mean, what's he supposed to do at that point? I guess I would say, okay, yeah, whatever, you got me. But I don't think he says that unless they've got this around and saying, we're going to go in and search your apartment. Again, I guess at this point, I just don't see what it is that the officers have done that they could not have otherwise done without a warrant. And I do think that the execution matters. But even if you were to disagree with respect to the fruit of the poisonous tree doctrine here, which you could then get to the probable cause. And I do think that this warrant establishes a probable cause, just based on the assertions made in the affidavit. And then even if you go beyond probable cause, you have good faith where this officer has not done anything. There's no misconduct in this situation. You have a search warrant where this officer has said this is... Well, but it doesn't have to be misconduct. I mean, nobody is saying that they lied, I guess, in the affidavit, in the DVR warrant. It's just that it doesn't seem like there's very much there that there's probable cause to think that this was an arson, right? I mean, there's a fire, but I don't know, beyond that, what is it in that warrant that would establish there's probable cause to think a crime was committed? Well, you have the victim who says that there are $8,000 worth of items in the shed, that someone was observed accessing the shed prior to the fire, immediately prior to the fire, removing items from the shed. But that was an anonymous source? I'm sorry? Is this the anonymous tip? It is an anonymous tip. Corroborated? I believe that the person... I mean, have they used the anonymous source before? I mean, we can go through the whole test about when do you trust an anonymous or a confidential informant? Obviously, it's not a known informant, so it's anonymous. I mean, is there corroboration? In this sense, there is corroboration between the statements being made by the anonymous source and then also the arson investigator's investigation where he determines that this is an incendiary fire. That's just a conclusion. There's nothing to base that on. Well, I think that this piece of information are feeding onto one another. Well, the language is, I'm looking at the affidavit, according to the victim, a witness explained to her that someone was observed pulling up to the residence, entering the property, and removing items from the shed around the time of the fire. All this is anonymous and unidentified people. Even the victim is unidentified. I mean, don't we have cases like Helton and Hython that say, you've got to have something more than that, and if there's nothing more to support, you've got to at least have police investigation and corroboration, and there's none of that either. And I think that one of the problems that we're having with this case is partly that it doesn't fit easily into this court's jurisprudence on probable cause and good faith because it's not often that we see a warrant that's asserting, no one's asserting that Mr. Wade himself was involved in criminal activity or that there's criminal activity ongoing at his property. It's simply that he has these cameras that are capable of viewing where the arson occurred and then taking that information to create the fair probability that evidence of a crime will be found in the location. So I think that that's why it just doesn't fit quite as nicely as when we have allegations that, oh, this person is known to be a drug trafficker and that, oh, they were just... That's why we're here because we've got a case that's somewhat in the gray area. Yes, and it's a very unique case and it is an oddity in many ways. You had asked if we had ever seen one like this. I was not able to find one that is analogous to this case. I was going to ask if you lose on the first warrant, what's your best case to uphold the second search? To uphold the second search? If I lose on the first warrant with respect to good faith also in terms of... I think that there's enough for good faith... Well, with respect to the law and any kind of legal decision by this court, that's what I'm looking for, to uphold the search of the... To uphold the narcotics warrants? Yes. Well, I believe... I mean, there's certainly probable cause for the narcotics warrants and I think that the decisions, the Elmore and the Hearn decisions, where you don't actually derive any evidence from a search or a frisk that's actually being challenged, which is what we have here. We have a search warrant that's being challenged that wasn't actually executed. So I think those cases fall in as some of our best... I have to say, I don't find Hearn very persuasive. I mean, Hearn was a domestic violence call, right? So they were lawfully on the premises in the first place, unlike here if the DVR warrant wasn't valid. And then when they enter, they had already patted him down in Hearn and it was, as counsel for the defense says, he just sort of volunteered, oh, I've got a weapon in here. I mean, that's different than the officer here saying, hey, you got something to hide with drugs? And then before he says, oh, there's a little marijuana. So anyway, I don't find Hearn particularly on point. Well, I guess, I think that what I would come back to is this idea that the fruit of the poisonous tree really derives from the exclusionary rule, this judicially created remedy for when we want to deter police conduct. And I simply don't see what these officers did that would constitute misconduct. What are we attempting to deter by exclusion in this case? Presumably trying to deter getting warrants that everybody knew or should have known was not valid, the DVR warrant, because of such insufficient, unsupported, you know, allegations that didn't really back up that there was even arson to be suspected. I mean, that's where everything starts with the DVR warrant being sufficient. If it's sufficient, I tend to think everything else is going to fall in place for the government. But if the warrant is insufficient, then you've got all these issues of exploitation and fruit of the poisonous tree for everything that happened when those officers showed up with the DVR warrant to insist on going into his apartment three. Well, I think that reading this warrant based on a common sense interpretation and giving great deference to the issuing magistrate, that this establishes probable cause. And at the very least, if it does not establish probable cause, an objectively reasonable officer could have relied on this warrant and did. You say that, but what about our cases like Helton and Hython? Those are cases where we've held on similar skimpy affidavit stuff. There was not only no probable cause, but no good faith. Well, and I guess that just goes back to my argument about this is not, this case, because of the oddity that it is, it doesn't fit neatly into that case law. I think that this officer, you know, went and got this warrant believing that he had probable cause to get these cameras. This is a very narrow warrant. You know, all he is permitted to do, all he is authorized to do is go into the apartment, obtain these recordings, and then to come out with that evidence that would provide, you know, indication about what was happening on that property prior to the time of the fire and during the time of the fire. I mean, I think that we have a district court here who found probable cause and that these officers can't find any signs of misconduct by these officers. You know, one of the things I find, though, the district court opinion gives a few facts that are not in the affidavit, like that the property was vacant. You know, but we can't look at that, right? Doesn't our case law like Abernathy say you have to base it on the four corners of the affidavit because you want a magistrate who exercises some independent judgment, not just, oh, yeah, police officer, you want a warrant, I'll give you a warrant. Yes, and obviously, yes, you cannot take into consider those factors. I think the court was considering those factors in part in response to arguments that were made by defense counsel, but I think the most salient facts here for the court were the location of these cameras, the witness's statement, and then that in conjunction with the fire. Well, but the location of the cameras has nothing to do with whether there was probable cause to get the DVR warrant in the first place. I mean, the fact that there were cameras in an adjacent property had nothing to do with was there a likelihood of arson in this shed fire. Right. I mean, as you say, the defendant had nothing to do with the fire itself, right? Nobody is claiming he caused anything to do with that adjacent property. Correct, correct. This is simply that the fire arson investigator concluded that this was an incendiary fire, that there are witness statements to support that someone was accessing the shed. There were means to access the shed at the time of the fire, and I think that all of those combined were the basis of the probable cause determination, and then even if that were somehow not sufficient, then an objectively reasonable officer could have relied on it. You're not making a good faith argument, by the way, on the narcotics warrants, are you? Can you make a good, I don't even know if you can. If I rely on Fruit of the Poisonous Tree in a warrant, but I do it in good faith, could Leon apply? I thought the confession was good, it turns out it was bad, but I rely on it in the warrant, I did it in good faith. Would that ever be a good argument? You're not making that argument though. Well, I mean, it's hard to untie all of these, you know, this is all happening about the same time. Right, but what I'm saying is that if I were to say, hey look, the car, the confession, the hole in the ceiling, all that stuff is Fruit of the Poisonous Tree, it all formed the basis though of a warrant, that warrant is not bare bones. I, in good faith, relied on that stuff in the warrant. Can the good faith exception apply? The officers relied on the warrant, on the narcotics warrants, based on the information contained within them. Exigency, I mean, I think that what you're talking about is that you have officers, the probable cause basis for there being marijuana in the apartment is both based on the statement, there is in fact marijuana in the apartment, and in addition to what was found inside the car. So, you know, candidly, I'm not sure if absent that marijuana being in the house. I don't think what's in the car is going to help you with a probable cause that there might be a crime in the apartment. We've got cases that say the fact that you're even a known drug dealer doesn't mean you can get a warrant. And I think that the basis of there being probable cause in the apartment is that statement about the marijuana. I would just go back to the point that, which possibly the court will disagree with me, but that that statement that Consignio Wade made was not under any kind of coercion, any kind of duress, and in fact the court found, you know, he had originally claimed with respect to the Miranda violations that actually that's why the poisonous tree doctrine should apply, and the court declined that reasoning, and then in fact, and they're not actually challenging that on appeal. Right. Okay. Thank you. Thank you. Roberto. Thank you, Your Honor. In regards to good faith, there's one point that hasn't really been discussed yet, and that is the lack of any nexus in the affidavit. We had a warrant that was for apartment three, and we had an affidavit that never once, at least in the body of the affidavit, never once even mentioned apartment three. So going back to would a reasonably prudent officer rely on that, I think that's another factor to say, in addition to the non-corroborated anonymous source, to say a reasonable officer would not rely on that. You mean that the DVR equipment was in apartment three. That was the mother's statement, but you're saying it didn't make it into the actual affidavit. Absolutely. Nothing in the affidavit about apartment number three at all. Okay. She had said that though, right? I mean, she had told the investigator that the camera equipment is in apartment three, right? She had the day before. Okay. But again, it did not. But you're saying it didn't get into the actual affidavit. It did not get into the affidavit and there's no indication that the issuing judge knew it somehow separate and apart from the affidavit. So that was completely not considered by the issuing judge or not able to be considered. In regards to the coercion aspect, again I would go back to the idea of Quincinio's reaction when he was told, we're not going to let you get the equipment, we're going to execute this warrant, sorry about your luck essentially, and that's according to the testimony when he became nervous, when he became upset, and then he was questioned. They had searched the car before he confessed though, right? There was a little ambiguity in the record about that. One of the officers testified a little differently than the other officer, but it was, it maybe was before, it was all right in the same time frame though. I'm just wondering if the car search could have led to the question about whether there were drugs as opposed to the car search, to Judge Gilman's point, the car search can't really support probable cause to search the apartment, but it could put them down the road of questioning him so that the confession I suppose was not necessarily just the result of the threatened execution of the warrant. But the car, again I would say that the car search though was also a result of the execution of the warrant because the car would never have been there. The car search is, but, this is the thing about the but for, yeah, it's but for them being there, the car search never would have happened, but are they exploiting the illegality of the warrant when they're searching the car? I mean the car is just there and yes but for, but we go beyond but for, so I mean I'm not sure about the car. Well they're exploiting the illegality of the search by bringing him there to begin with, whether it was in a car, whether it was on foot, they brought him there by- He came of his own volition, right? He came, yes, yes. His mother called him or some way she got to him and he came running or walking or whatever he did. They told the mother they were there to execute the warrant. They told the mother to call him and have him come to the property to let him in. Yeah, this is, what makes these kind of cases tough is what your man ended up with, what a 15 year sentence he's now serving? Yes sir. And he's clearly guilty, I mean in the sense that he had drugs and he had a weapon right up there. And so it's sort of one of these real fundamental cases of do we still suppress all that because of a greater importance of not having police get unauthorized warrants and not in good faith. But it makes it tough doesn't it because we're going to let a guilty guy off if we say it's not good. Well but that's the theory behind the exclusionary rule to deter the conduct and to put the police back in the position they would have been in if they hadn't exploited the illegality. Thank you and thank you for your, I think your CJA appointment. Thank you very much for doing that.